UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| DONNIE M. HEAD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   3:13-cv-00208-RLY-WGH |
| | ) |
| PROFESSIONAL TRANSPORTATION, | ) |
| INC., and RONALD D. ROMAIN, | ) |
| individually and as president of | ) |
| PROFESSIONAL TRANSPORTATION, | ) |
| INC., | ) |
| | ) |
| Defendants. | ) |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Donnie M. Head, brought a claim against defendants, Professional Transportation, Inc. ("PTI") and its president, Ronald D. Romain, under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 215(a)(3). Head alleged that PTI terminated his employment in retaliation for exercising his rights under the FLSA. PTI and Romain move for summary judgment. For reasons set forth below, the motion for summary judgment is **GRANTED**.

**I.     Standard**

Summary judgment serves to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Summary judgment is appropriate if the record "shows that there is no genuine dispute as to any

1

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  To survive summary judgment, the nonmoving party must present specific facts showing the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A genuine dispute of fact exists if, based on the evidence presented, a reasonable jury could return a verdict in favor of the non-moving party. *Id.* at 248.  When a party asserts that a fact is genuinely disputed or undisputed, that party must support its assertion either by citing specific materials in the record, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1)(A)–(B).  The court views all admissible evidence in the light most favorable to the nonmoving party, but it need not draw unreasonable inferences. *Tindle v. Polte Home Corp.*, 607 F.3d 494, 496 (7th Cir. 2010).

## II. Background

### A. Introduction

PTI provides ground transportation services for railroad crews.  Head was employed as an over-the-road ("OTR") driver for PTI at its Montgomery, Alabama branch from November 2007 to July 12, 2013, when PTI terminated his employment. (Filing No. 41-6 ¶ 3).

An essential job function of an OTR driver is the safe and timely transport of crew members along the rail lines. (Filing No. 41-3 ("Severin Aff.") ¶¶ 6).  When a rail carrier needs crew members transported, it contacts PTI's dispatch which then contacts "on-the-board," or available, OTR drivers to take the trip. (*Id.* ¶¶ 7–8).  The carrier provides the

2

"need time" and "point of origin" where the driver must pick up the crew. (*Id.* ¶ 8). The time between a carrier's request for a driver and the need time—the time by which the driver must arrive at the point of origin—is the "lead time." Lead times of thirty minutes or less are considered "ASAP" trips. (*Id.*). Once an OTR driver accepts a trip, he reports to PTI's terminal to pick up a van. The driver logs into the interactive GPS unit, called "Crew Mobile," which downloads the trip details and provides navigation information to the driver. The driver inputs certain information into Crew Mobile, such as start time, origin arrival time, and end time. In addition to trip information, the Crew Mobile units automatically track and record GPS data ("Trimble data") relating to the van's movement, such as longitude and latitude, driving speed, and the names of roadways travelled. (*Id.* ¶ 11; *see* Filing No. 55 ("Pl.'s Resp.") at 7 n.2).

During the relevant time period, PTI employed Andy Severin as general manager of its South Georgia Division, which includes the Montgomery, Alabama branch. (Severin Aff. ¶¶ 2–3). As general manager, Severin had authority to terminate OTR drivers at the branches over which he supervised. (Filing No. 41-4 ("Romain Aff.") ¶¶ 5–6). PTI's disciplinary policy progresses through four steps: (1) verbal warning, (2) written warning, (3) three-day suspension, and (4) termination. (Severin Aff. ¶ 13, Exhibit A).

Each day, PTI's general managers receive Absolute On-Time Performance Reports ("OTP reports"), reporting daily late trips for OTR drivers in their divisions. (*Id.* ¶ 12; Filing No. 63-1 ("Smith Suppl. Aff.") ¶ 4). OTP reports capture only those late trips that fall within certain pre-established, uniform parameters. (Smith Suppl. Aff. ¶ 4–

3

5). For instance, OTP reports do not include late trips where PTI, and therefore the driver, have insufficient lead time from the rail carrier, such as the case of an ASAP trip. (*Id.* ¶ 5). Trips with insufficient lead time routinely occur. (*Id.*). Severin reviews daily OTP reports and follows up with branch managers to determine what, if any, circumstances excuse the late trips, such as roadway related delays, family emergencies, or mechanical problems. (Severin Aff. ¶ 12).

### B. Disciplinary Measures Issued Against Head

PTI disciplined Head on five separate occasions for accepting a trip and failing to arrive by the need time. The first late trip occurred on January 16, 2013. (Severin Aff. ¶ 14). After dispatch failed to find drivers on the board, Head called dispatch and accepted the trip at 04:59 with a need time of 05:20. (Filing No. 55-5 ("Jan. 16 Recording"); Filing No. 55-7 at 1). Unbeknownst to Head at the time he called dispatch, he had listed himself as "Code 4"—PTI's code for a driver requesting eight hours of undisturbed rest—which explains why PTI did not contact Head to take the trip. (Jan. 16 Recording; *see* Filing No. 55-19 ("Severin Dep.") at 4). Head accepted the trip but advised dispatch of his estimated arrival time of 05:40. (Jan. 16 Recording). The GPS data, however, showed Head arriving at 05:49. On this basis, Severin issued Head a verbal reprimand. (Severin Aff. ¶ 14).

PTI issued a written reprimand to Head for a late trip on January 18, 2013. Head accepted the trip at 12:30 with a need time of 13:00, making it an ASAP trip, but he did not arrive to the point of origin until 14:21. (Severin Aff. ¶ 15). Head disputed the disciplinary action against him on grounds that the need time was thirty minutes from

4

when he accepted the trip and the point of origin was over an hour away. The undisputed evidence establishes, however, that PTI disciplined Head not for failing to arrive by the rail carrier's stated need time but for failing to arrive at PTI's terminal to initiate the trip until 13:22, fifty-two minutes after accepting the trip. (*Id.*).

Contrary to PTI's own four-step disciplinary policy, Severin suspended Head twice before terminating him. The first suspension resulted from Head's third unexcused late trip on April 16, 2013. The record shows that he accepted a trip with a need time of 06:00, began the trip at 05:54, and arrived at the point of origin at 06:10. (*Id.* ¶ 16). Head's second suspension followed a trip on June 22, 2013. He accepted the trip at 15:01 with a need time of 17:00. As discussed below, the parties rely on conflicting evidence to dispute whether Head arrived at the point of origin by the need time. Severin ultimately concluded that Head had no valid reason for failing to arrive at the point of origin by 17:00. (Severin Aff. ¶ 17). A written reprimand outlining the terms of Head's suspension stated that another unexcused late run would result in his termination. (*See* Filing No. 41-3 at 14).

Head's termination followed a fifth late trip on July 11, 2013. Head accepted the trip at 03:00 and assured dispatch that he would arrive at the point of origin by the need time of 04:00. (Severin Aff. ¶ 18). The railroad crew designated for pick-up called dispatch at 05:08 to inquire about their driver. At 05:09, dispatch called Head, who was at home. (*Id.*; Filing No. 41-13 Exhibit A). When asked by what time he could pick up the crew, Head reported for the first time that his vehicle would not start. Upon investigation, Mr. Severin determined that even if Head could not make the trip for lack

5

of transportation, he had no valid excuse for failing to timely notify dispatch. (Severin Aff. ¶ 18). On July 12, 2013, Mr. Severin terminated Head for excessive unexcused late trips. (*Id.*).

### C. Head's Protected Activity[1]

In late March 2013, PTI notified Severin that Gaines Harrell, PTI's branch manager in Montgomery, circulated a memorandum (the "Memo"), in violation of company policy, that instructed OTR drivers to arrive at the rail yard twenty minutes before their need times. (Filing No. 41-7 ("Cooley Aff.") ¶ 4; Severin Aff. ¶ 20). Harrell personally drafted and posted the Memo to help curb the problem of late trips at the Montgomery branch. (Filing No. 41-2 ("Harrell Dep.") at 5–6). Severin promptly instructed Harrell to remove the Memo and issued him a verbal reprimand. (Severin Aff. ¶ 20).

The parties do not dispute that Head took issue with the Memo and, through counsel, advised counsel for PTI, Linda J. Cooley, of its existence. Nor do the parties dispute that Head confronted Harrell immediately upon seeing the Memo. (*See* Filing No. 55-18 ("Head Dep.") at 42).[2] Head described the interaction as "vivid . . . in guy

---

[1] In his Complaint, Head alleges PTI retaliated against him because, *inter alia*, he opted into two collective actions against PTI: *Matthews v. Professional Transportation Inc.*, No. 11-cv-97 (S.D. Ind.) and *Miller v. Professional Transportation Inc.*, No. 09-cv-111 (S.D. Ind.). In response to PTI's motion for summary judgment, Head does not present evidence of or even mention retaliation based on this participation. Head, therefore, waives his retaliation claim on these grounds. *See Palmer v. Marion Cty.*, 327 F.3d 588, 597 (7th. Cir. 2003) (finding argument fails on summary judgment when no evidence presented in support)

[2] The parties designate different portions of Head's deposition. For ease of reference, the court will first note the filing number of each designation and, thereafter, refer to each simply as

terms," as he explained to Harrell that "this wasn't China, and [Harrell] couldn't work [OTR drivers] like that . . . ." (*Id.*). In response to Head's concern, Harrell described the Memo as merely an unenforceable recommendation. (Harrell Dep. at 9). Head, however, testified that he did not discuss the Memo with anyone else at PTI. (Filing No. 41-1 ("Head Dep.")  at 45–46).

### III. Discussion

The FLSA makes it unlawful for an employer to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to" the FLSA. 29 U.S.C. § 215(a)(3). Head has the burden of establishing that PTI engaged in retaliatory conduct using either the direct or indirect methods of proof. *Cichon v. Exelon Generation Co.*, 401 F.3d 803, 810 (7th Cir. 2005) (citing *Scott v. Sunrise Healthcare Corp.*, 195 F.3d 938, 940 (7th Cir. 1999)). Both methods, however, converge on the question of whether a reasonable trier of fact could infer retaliation from the evidence presented. *See Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015) (questioning the utility of distinguishing between the direct and indirect methods of proving discrimination or retaliation claims under Title VII). Head appears to present evidence under both methods.

---

"Head Dep." followed by citation to the deposition page, not the filing page. Citations to all other deposition transcripts will cite to the filing page.

### A.     Direct Method

To establish retaliation through the direct method of proof, a plaintiff must present evidence of three elements: (1) he or she engaged in protected activity and (2) suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment action. *See, e.g.*, *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). For purposes of summary judgment, the parties dispute only whether Head can establish the causal link between his protected activity—reporting the memo—and subsequent termination. Head has the burden of showing that PTI would not have fired him but for his protected activity. *O'Donnell v. America At Home Healthcare & Nursing Servs., Ltd.*, No. 12-cv-6762, 2015 WL 684544, at *7 (N.D. Ill. Feb. 17, 2015) (citing *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015)); *see Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. —, 133 S. Ct. 2517, 2528, 186 L. Ed. 2d 503 (2013) (holding that plaintiffs have burden of proving but-for causation for claims brought under Title VII's similarly-worded anti-retaliation provision).

The direct method of proof requires the plaintiff to present either direct or circumstantial evidence of retaliation. Direct evidence, if believed, "will prove the particular fact in question without reliance upon inference or presumption." *Volovsek v. Wisconsin Dept. of Agric.*, 344 F.3d 680, 689 (7th Cir. 2003) (citation omitted). If uncontradicted, direct evidence of retaliation defeats summary judgment, unless the defendant presents unrebutted evidence that it would have taken the adverse employment action against the plaintiff even if it had no retaliatory motive. *Stone*, 281 F.3d at 644.

Head does not claim to have any direct evidence of PTI's retaliation—i.e., an admission from the decision maker, Severin, that he fired Head because he reported the Memo.

Instead, Head relies on circumstantial evidence of PTI's retaliation. He must present "a convincing mosaic of circumstantial evidence" sufficient to permit a reasonable jury to infer retaliation. *Castro*, 786 F.3d at 564–65. In retaliation cases, the Seventh Circuit recognizes three categories of circumstantial evidence available to plaintiffs: (1) evidence of suspicious timing, ambiguous statements, or other behavior tending to support an inference of retaliation, (2) evidence that similarly situated employees were treated differently, and (3) evidence that the employer's proffered reason for the adverse employment action is pretext. *E.g.*, *Volovsek*, 344 F.3d at 689–90. Each category of evidence may by itself defeat summary judgment, but plaintiffs may use them together. *Castro*, 786 F.3d at 565.

Head presents evidence of all three categories, but he relies heavily upon evidence he claims shows disparate treatment between Head and other employees who did not engage in protected activity, including (1) a statistical summary of driver data for all drivers operating under Severin and (2) evidence that Severin had Head disciplined for late trips that were not in fact late.[3]

---

[3] In its reply brief, PTI inserted a section labeled "Motion to Strike," containing an enumerated list of objections to evidence presented in Head's response in opposition to summary judgment. (*See* Filing No. 63 at 2). Local Rule 56-1 advises against such collateral motions in the summary judgment process and instead directs parties to raise objections as to admissibility within their respective briefs. S.D. Ind. L.R. 56-1(i); *see also* S.D. Ind. L.R. 7-1(a) (requiring parties to file motions separately and instructing them against embedding motions within briefs on previously filed motions). The court, therefore, construes this section in PTI's brief as its objections to Head's designated evidence and not a separate motion to strike. The court will resolve objections as necessary.

### 1.     Crew Mobile and Trimble Data

Pursuant to orders of the Magistrate Judge on two motions to compel, PTI produced all trip data generated through Crew Mobile for all drivers at PTI terminals over which Severin had management authority. This production included data for all driver trips made from January 16, 2013, to Janauary 16, 2014. (Filing No. 56 ("Smith Decl.") ¶ 3; Pl.'s Resp. 7–8). PTI also produced raw Trimble data—GPS data generated upon movement of the vehicle, not driver input—for nine individual drivers. (Smith Decl. ¶¶ 7–9). Head designates a compilation of the raw Crew Mobile data, which included 16,925 individual trips. (*See* Filing No. 55-1 ("Summ."); Smith Decl. ¶ 3). In an accompanying affidavit, Head's counsel, Terry Smith, testifies that he determined the number of late trips for each driver using PTI's metric for lateness—whether the driver arrived at the point of origin after the need time. (Smith Aff. ¶ 3). Head stresses that he had only twenty-four late trips compared to the 133 other drivers who had twenty-four or more late trips. Indeed, Head tallied more than fifty late trips for several drivers. This, Head argues, establishes that Severin did not uniformly apply PTI's disciplinary procedure for late trips.

In its reply brief, PTI objects to the compiled data and Mr. Smith's first declaration on grounds that Mr. Smith lacks the requisite personal knowledge to interpret the Crew Mobile data. In support, PTI introduces new evidence to support its assertion that general managers, such as Severin, receive daily OTP Reports that capture only certain late trips falling within fixed uniform parameters. (Filing No. 63-1 ("Taraha Smith Aff.") ¶ 4). For example, ASAP trips—those with lead times of thirty minutes or

10

less—do not appear in OTP Reports. (*Id.* ¶ 5). Thus, PTI submits, Head's summary of the raw Crew Mobile data does not accurately reflect the late trips Severin would have investigated as potential grounds for disciplining drivers. PTI also charges Head with misreading the raw data, asserting that Crew Mobile and Trimble data are reported in Eastern Standard Time and Central Standard Time, respectively. Correcting for the time zone difference, according to PTI, eliminates many of the alleged late trips in Head's summary.

In light of PTI's new evidence, Head filed a surreply to address PTI's objections to the summary of Crew Mobile data. Head devotes most of his surreply to dismantling PTI's claim that Crew Mobile and Trimble data are reported in different time zones. Head compares trip information from Crew Mobile with corresponding Trimble data for a single trip and purports to establish that PTI's claim regarding time zone differences does not hold up.[4] This apparent inconsistency between PTI's representation of a difference in time zone and what the data actually reflects, Head maintains, creates a genuine dispute of material fact.

Whether Head has identified error in PTI's representation of the data does not cure his failure to establish the accuracy of the summary. Parties may not rely upon inadmissible evidence to either support or oppose summary judgment. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("Admissibility is the threshold question because a court may consider only admissible evidence in assessing a motion for

---

[4] Head shows that for this single trip, the arrival times between the Crew Mobile and Trimble data reflect no time zone difference. (*See* Filing No. 65 ("Pl.'s Surreply") at 7–8).

summary judgment."). Federal Rule of Evidence 1006 permits the use of a summary to prove the contents of voluminous data. Proper use of a summary obviates the need to introduce the underlying data as evidence because the summary itself constitutes substantive evidence. *United States v. White*, 737 F.3d 1121, 1135 (7th Cir. 2013). However, Rule 1006 "requires a proper foundation as to the admissibility of the material that is summarized and a showing that the summary is accurate." *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008) (internal quotation and alteration marks omitted).

Head does not mention, much less rebut, PTI's evidence that OTP Reports capture only those late trips falling within certain parameters. Nor does Head alter or defend the conclusions he draws from his summary. Although a mere possibility of the summary's inaccuracy does not warrant its exclusion from consideration, *see Fidelity Nat'l Title Ins. Co. of New York v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 753 (7th Cir. 2005), PTI's unrebutted evidence establishing its invalidity leaves the court with no option but to find the summary inadmissible.[5] Accordingly, Head's subsequent efforts to discredit the very data he attempts to assemble and draw conclusions from are unavailing.

---

[5] The court observes a more glaring fallacy in Head's compilation of the Crew Mobile and Trimble data. The data encompasses twelve months of driver data—January 16, 2013 to January 16, 2014. Head, however, was terminated on July 12, 2013. Thus, even if the summary accurately represented the number of trips PTI considered late, comparing tallies of late trips accrued by drivers in a year to that of Head, whose tally reflects only six months of driving, renders the summary meaningless.

### 2.     Head's Late Trips

Head presents evidence to challenge Severin's stated reasons for disciplining him for the January 16 and June 22 trips.  Head submits that Severin had no basis to consider these trips late and, therefore, casts doubt upon the credibility of his stated reason for disciplining and ultimately firing Head.

Head first challenges whether Severin fairly considered him late for the January 16 trip, which resulted in a verbal warning.  Head produces the trip details for this trip indicating that Head departed for the point of origin only seven minutes after accepting the call.  Head suggests that he did PTI a favor when he took the trip notwithstanding his "Code 4" status and, therefore, was wrongfully disciplined for arriving late.  The court agrees.  However, Head did not engage in protected activity until March 2013 when he reported the Memo.  Thus, any dispute as to whether Head's January 16 trip warranted disciplinary action cannot possibly support an inference of causation between his protected activity and termination.  *See Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1122 (7th Cir. 2009) (noting that a claim of retaliation for engaging in protected activity requires plaintiff to show that the decision maker had knowledge of the protected activity).

Head also produces trip details for and testimony concerning the June 22 trip, which resulted in his first three-day suspension.  Head takes issue with Severin's decision to suspend him because the vehicle did not move until 17:02 when the need time was 17:00.  This misapprehends Severin's proffered explanation.  Severin testifies that Head accepted the trip with a need time of 17:00 at a point of origin approximately one-tenth of

13

a mile away. Head *departed for* the point of origin at 17:02 and arrived at 17:04. (Severin Aff. ¶ 17). The undisputed evidence establishes that Severin held drivers accountable for timely arrival once they accepted a trip. (*See* Severin Dep. at 6; Pl.'s Resp. at 5). Although Head seems to question the reasonableness of disciplining a driver over four minutes, he has not presented any evidence to contradict Severin's testimony as to what the Trimble (or GPS) data confirms or establish that Severin treated Head differently than other drivers.[6]

### 3. Alleged Response to Head's Application for Unemployment Benefits

PTI objects to Head's designation of two documents that purportedly illustrate the animus Severin harbored toward Head. According to Head, one document is Severin's response "to an appeal of [Head's] request for unemployment with the [Alabama Department of Labor]." (Filing No. 55 at 2, 9). On its face, it appears to be a copy of an email sent from Severin to PTI's Montgomery branch on June 23, 2013, concerning Head's late trip on June 22. The text indicates that Severin instructed the branch manager to suspend Head for three days and remind him that another late trip would result in his termination. It also appears that Severin inserted the GPS information for Head's June 22

---

[6]    Head cites the testimony of Mike Sellers, a CSX crew member designated for pick-up on June 22, as stating that Head arrived at the point of origin before the need time. (Filing No. 55 at 12). This grossly mischaracterizes Sellers's testimony. Sellers testified that he was the first crew member on duty and noticed that Head had already arrived. But Sellers specifically testified that he did not know if Head had arrived by the need time of 17:00. (*See* Filing No. 55-23 at 6–7). Because Seller's own testimony establishes his lack of personal knowledge to testify to whether Head met PTI's expectations for OTR drivers, the court excludes it from consideration.

trip into the email along with corresponding notes from the dispatcher. In relevant part, the dispatcher notes appear as follows:

> [IVR at 06/22/2013 15:01 Eastern Time]
> Driver Accepted Trip
>
> [rloos at 06/22/2013 17:17 Eastern Time]
> driver called in to report problems with the mobile device
> said the screen will not come on
> geomanager shows the van has a low battery, so that may be related
> driver advised to record trip on paper

(Filing No. 55-4). The second document contains the dispatcher notes above plus an additional comment:

> [rloos at 06/22/2013 17:17 Eastern Time]
> driver called in to report problems with the mobile device
> said the screen will not come on
> geomanager shows the van has a low battery, so that may be related
> driver advised to record trip on paper
> **gps tracking does show the driver at the pick up point on time**

(Filing No. 55-3 (emphasis added)). Based on this discrepancy, Head claims Severin purposefully omitted the last line of the dispatcher's note from the document he sent to the Alabama Department of Labor.

PTI objects to both documents on grounds that Head failed to properly authenticate them. Head counters that PTI implicitly authenticated the documents because they produced them during discovery. The court disagrees. "The mere act of producing a document in response to a discovery request based on the content of the document does not amount to an admission of the document's authenticity." *Castro*, 786

15

F.3d at 578 (emphasis omitted). Even in his surreply, Head failed to lay a foundation for the documents setting forth, at minimum, when, why, and how Severin produced this document.[7] Mr. Smith's testimony that PTI produced the documents "in the normal course of disclosures" does not suffice. *See id.* (finding plaintiff's use of similar language in a sworn declaration did not suffice to authenticate documents produced by defendant). Moreover, Head's bare assertion that Severin sent the first document to the Alabama Department of Labor finds no support in the designated evidence. Even if the court accepted this evidence as Head represents it, he has a temporal problem because any application for unemployment benefits would have followed his termination. For these reasons, the court omits the documents from consideration.

### 4. Evidence that Severin had Knowledge of Head's Protected Activity

The remainder of Head's circumstantial evidence consists of deposition testimony of current or former employees of PTI's Montgomery branch. Head cites this testimony as evidence of pretext under the indirect method of proof, but because it is the only evidence tending to show that Severin had knowledge of Head's protected activity before he terminated him, the court turns to it here. Furthermore, to survive summary judgment under either the direct or indirect methods of proof, the plaintiff must show the decision maker had knowledge of the protected activity. *See Nagle*, 554 F.3d at 1122 (noting that

---

[7] Head states that Severin could not explain the apparent discrepancy between the documents at his deposition, but Head neglected to provide the court the relevant portion of Severin's deposition transcript.

16

both methods of proof presuppose the decision maker's knowledge of the plaintiff's protected activity).

The parties dispute whether Mr. Severin knew that Head, through counsel, reported the Memo to PTI's counsel. PTI relies on the sworn affidavit of Linda Cooley, one of the attorneys hired to represent PTI in the aforementioned collective actions. Ms. Cooley testifies that Head's counsel, Joseph Cassell, informed her that a driver in PTI's Montgomery office had reported the Memo. (Cooley Aff. ¶ 4). She specifically instructed Mr. Cassell to not disclose Head's identity, but to provide her only the branch manager's name who posted the Memo. Despite her instruction, Mr. Cassell subsequently emailed Ms. Cooley identifying Head as the reporting driver and Harrell as the branch manager. (*Id.*). Ms. Cooley testifies that she informed PTI's corporate team of the Memo's existence but deliberately withheld Head's identity as the reporting driver until Mr. Cassell informed her of a potential retaliation claim following Head's termination. (*Id.* ¶¶ 5–6).

Head does not dispute this evidence. Instead, he presents testimony of PTI employees Helen Kelsey and Linda Denton to create a "convincing mosaic" of circumstantial evidence establishing that word of Head's reporting the Memo had reached Severin. Kelsey testifies that Gaines and Severin were "real close." (*See* Filing No. 55-21 ("Kelsey Dep.") at 6). The basis for this testimony, however, is her observation that "Gaines would mention that he had talked to [Severin]" about matters involving, for example, van maintenance. (*Id.*). Kelsey also testifies that she overheard Gaines complaining about OTR drivers failing to arrive on time or clean and fuel the

17

vehicles. (*Id.* at 2–3). During this conversation, Gaines mentioned Head's name, among others, as drivers he wished to have terminated. (*Id.* at 3). Head cites testimony of Linda Denton establishing Harrell knew that Head reported the Memo. Denton testifies that she and Harrell had a conversation in which Harrell was upset because Head "went over [Harrell's] head" in reporting the Memo.[8] Based on the foregoing testimony, Head argues, a reasonable jury could infer that Harrell informed Severin as to how the Memo reached PTI's headquarters.

PTI does not dispute whether Harrell knew Head reported the Memo or even whether Harrell harbored animus toward Head. PTI argues, rather, that Head has failed to present sufficient evidence to permit a reasonable inference that Severin, the decision maker, had knowledge of Head's protected activity. The court agrees. The only link Head makes between Harrell and Severin comes from Helen Kelsey's testimony that Severin and Harrell were "close." As suggested above, however, Kelsey's bold assertion hardly follows from her personal knowledge of their alleged relationship. Even if Head presented evidence of a close friendship between Harrell and Severin, this alone does not support an inference that Severin knew of the protected activity, much less that he terminated Head because he reported the Memo. *See Tindle v. Polte Home Corp.*, 607

---

[8] Head also cites testimony of Carrie Malish to establish that rumors circulated among the employees of Head obtaining counsel because of the Memo. (*See* Filing No. 55-20 at 7–8). As PTI argues, however, this testimony amounts to inadmissible hearsay under Federal Rule of Evidence 802. *See Gunville*, 583 F.3d at 985 (stating rule that a party may not rely upon inadmissible hearsay to oppose summary judgment).

F.3d 494, 496 (7th Cir. 2010) (noting that a court need only make reasonable inferences in favor of the nonmoving party).

In sum, Head has failed to present sufficient evidence to support an inference that Severin terminated Head because he reported the Memo. Head has produced no admissible evidence suggesting that he was treated any differently than other OTR drivers. Nor has he produced any evidence to challenge Severin's proffered reason for terminating him. Perhaps most fatal to Head's claim is the lack of evidence that Severin had actual knowledge of Head's protected activity.

### B.     Indirect Method

Similarly, Head's claim fails under the indirect method of proof. To make a *prima facie* case under this framework, the plaintiff must show that (1) after engaging in protected activity he suffered an adverse employment action; (2) at the time, he performed his job in a satisfactory manner; and (3) no other similarly situated employees who did not engage in protected activity suffered the adverse employment action. *Stone*, 281 F.3d at 644. Failure to establish any one element of the prima facie case entitles the defendant to summary judgment on a retaliation claim. *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004). In his attempt to satisfy the second and third prongs, Head relies exclusively upon his summary of the Crew Mobile and Trimble data, which the court has already excluded from consideration. Therefore, the court's inquiry ends here.

## IV. Conclusion

For the reasons set forth above, Defendants' Motion for Summary Judgment (Filing No. 41) on Head's retaliation claim is **GRANTED**. Final judgment consistent with this Entry shall now issue.

**SO ORDERED** this 30th day of September 2015.

_____
RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.